**Gloria BLESY, an Infant, by Werner Blesy, her father and natural guardian, and Werner Blesy, Individually, Plaintiffs,**

**v.**

**UNITED STATES of America, Eugene Flynn and John Flynn, Defendants.**

**No. Civ–1970–556.**

United States District Court,
W. D. New York.

Jan. 9, 1978.

Paul William Beltz, P. C., Buffalo, N. Y., for plaintiffs.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (William M. Skretny, Asst. U. S. Atty., Buffalo, N. Y., and James P. Klapps, Dept. of Justice, Atty., Washington, D. C., of counsel), for defendants.

CURTIN, Chief Judge.

This case was brought under the Federal Tort Claims Act to recover damages arising out of a two-car collision in Hamburg, New York, between the plaintiff and defendant Eugene Flynn, a serviceman. The defendant United States moved for summary judgment on the issue of its liability, claiming that Flynn was not acting within the scope of his employment at the time of the accident. The parties agreed to a bifurcated trial, with this issue to be determined in advance of a trial on the questions of Flynn's negligence and damages. On July 28, 1976, a trial was held, at which the Government called Colonel Chester Bobinski to testify as a witness on its behalf. The trial record consists of Col. Bobinski's testimony, and the affidavits and exhibits submitted by the parties on the motion. The court has carefully considered the record, and finds that the plaintiff has prevailed.

Because the law of respondeat superior requires a careful analysis of the circumstances surrounding an accident, the facts in this case merit close attention. In October of 1969, Eugene Flynn was stationed at Fort Gordon, Georgia, on active duty with the United States Army. At that time, he applied under the "compassionate reassignment" regulations for a transfer to another base closer to his hometown of Kersey, Pennsylvania, because of his mother's terminal illness. After he applied, Flynn received orders transferring him to Germany, but the transfer was held in abeyance pending a final decision on his application for compassionate reassignment. On November 26, 1969, special orders were issued approving his application and transferring Flynn from Ft. Gordon to the Niagara Falls Support Detachment in New York.

The orders prescribed a departure date from Ft. Gordon of December 3, 1969, and a due date at the Niagara Falls Support Detachment of December 13, 1969. Flynn was given seven days of delay en route and three days of travel time. The mode and time of travel were left to Flynn's discretion, but travel by privately owned vehicle was among the alternatives authorized. Flynn was reimbursed for travel expenses at the rate of six cents per mile, measured by a direct route calculation from Ft. Gordon to Niagara Falls. This calculation did not depend on the mode of travel selected or the actual mileage traveled.

On December 3, Flynn flew by commercial airline to Dubois, Pennsylvania, where he was driven by his family to their home in Kersey. He remained at home until December 12, at which time he left for Niagara Falls in his father's car. The trip was expected to take four to five hours. Although Flynn was not due at the Niagara Falls base until December 13, he intended to arrive early in order to process in at the base.

At about 11:50 a. m. on December 12, Flynn's car collided with the plaintiff's car while he was driving in a northerly direction on U. S. Rt. 219 in Hamburg, New York. The plaintiff was seriously injured.

On January 30, 1970, Flynn was notified by the Army that it considered him to be acting "in the line of duty" at the time of the accident pursuant to Army Regulation 600–10. As a result of this determination, Flynn's medical expenses and other costs related to the accident were paid by the Army.

The plaintiff commenced this personal injury action against Flynn, Flynn's father (the owner of the automobile), and the United States. The defendant United States argues that it is not vicariously liable for alleged negligence on the part of Flynn because Flynn was not acting within the scope of his employment at the time of the accident.

■ The Federal Tort Claims Act states that the United States is liable for personal injuries caused by the negligent or wrongful acts of government employees "while acting within the scope of [their] office or employment." 28 U.S.C. § 1346(b). Standards for determining liability are the same as those applicable to "a private individual under like circumstances." *Id.* § 2674. In determining whether the Government is lia-

ble under the doctrine of respondeat superior, the law of the state in which the accident occurred applies. *Williams v. United States,* 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955). In this case, the parties agree that New York law controls.

■ The first question to be resolved is whether the Army's determination that Flynn was acting "within the line of duty" at the time of the accident is dispositive of the issue of whether he was acting within the scope of his employment. I find that it is not. Under Army Regulation 600–10, a serviceman who is injured while on active duty is presumed to be acting in the line of duty provided that the injury did not result from intentional misconduct or willful negligence. This standard is different from the standard under respondeat superior doctrine, and therefore does not control the issue of the United States' liability to the plaintiff.

Turning to the New York law of respondeat superior, the determination of whether an employee is acting within the scope of employment does not hinge upon any single circumstance but requires a close analysis of the precise facts before the court. *Riley v. Standard Oil Co.,* 231 N.Y. 301, 132 N.E. 97 (1921). Two conditions, however, must be satisfied. First, the employer must be exercising or have the power to exercise some control, directly or indirectly, over the employee's activities. Second, the employee at the time of the accident must be acting in furtherance of the duties owed to the employer. *Lundberg v. State,* 25 N.Y.2d 467, 306 N.Y.S.2d 947, 255 N.E.2d 177 (1969).

As to the first condition, New York case law does not require the employer to be exercising direct control over the physical details of driving or the route selected. For instance, a number of cases have held the employer liable where the employee was driving a privately owned vehicle. *See, e. g., Cooke v. Drigant,* 289 N.Y. 313, 45 N.E.2d 815 (1942); *Kanigher v. Schwerin Air Conditioning Corp.,* 280 N.Y. 751, 21 N.E.2d 520 (1939); *Burdo v. Metropolitan Life Insurance Co.,* 279 N.Y. 648, 18 N.E.2d

42 (1938). As the court stated in *Gutov v. Krasne,* 266 App.Div. '302, 42 N.Y.S.2d 20, 22 (1st Dept. 1943), *aff'd,* 292 N.Y. 602, 55 N.E.2d 372 (1944), where the issue was whether a particular agent was a servant or an independent contractor:

> In effect, what the trial court told the jury was that liability of defendant for the driver's acts depended upon his right to control the driver's physical operation of the automobile at the time and place of the accident. This definition was too narrow. The test rather is whether the defendant had the right of general control over the driver as to how the business being carried on should be done.

■ The Government urges that its indifference to and lack of control over the means of transportation used by Flynn should be decisive in this case. Under New York law, however, lack of control over the details of driving does not exculpate the United States, even when the employee selects a privately owned vehicle as his means of transportation. *Cooke v. Drigant, supra.* The Fourth Circuit, in an exhaustive analysis of the New York doctrine of respondeat superior as it applies to military personnel, stated the rule as follows:

> [The test] takes into consideration all elements and does not preclude the employer's liability because the employee was optionally using his own vehicle, over a route and in a manner which was not, in fact, specifically controlled by the employer. The test is not, as it may be in other jurisdictions, one that requires the particular activity at the time of the accident, *i. e.,* the driving, to be the normal duty of the servant but is, rather, whether the master's business is then being substantially furthered. *Cooner v. United States,* 276 F.2d 220, 230 (4th Cir. 1960).

But even if New York law did require a showing that the details of driving were subject to the employer's control, the necessary element of control is present in this case. It is the right to control, not the exercise of it, that is important for the application of respondeat superior. *Re-*

*statement (Second) of Agency* §§ 14, 220 (1958). Flynn at all times was accountable to the Army for his actions under the Uniform Code of Military Justice, including the manner in which he drove his automobile. 10 U.S.C. § 911. Whether he was on leave or travel status, the Army had the right to order him to temporary duty. At all times he was subject to military standards of conduct, appearance, and safety. Even though the Army may have been indifferent to the route or mode of travel chosen by Flynn, there is no question as to its power to control his behavior, including the details of driving. *See Johnson v. Franklin,* 312 F.Supp. 310 (S.D.Ga.1970); *O'Brien v. United States,* 236 F.Supp. 792 (D.Me.1964). Accordingly, the court holds that the first condition of liability is satisfied.

■ Some courts have taken the position that the Government's ability to control the activities of military personnel arises by virtue of its unique military capacity rather than its status as employer, and that this right to control is not relevant in resolving questions of respondeat superior liability. *See, e. g., Chapin v. United States,* 258 F.2d 465 (9th Cir. 1958); *North Carolina State Highway Commission v. United States,* 288 F.Supp. 757 (E.D.N.C.1968), *aff'd,* 406 F.2d 1330 (4th Cir. 1969). The Federal Tort Claims Act, however, equates "acting in line of duty" with "acting within the scope of his office or employment." 28 U.S.C. § 2671. This language has been interpreted as reflecting Congress's intent to take into consideration the special characteristics of military employment. *Hinson v. United States,* 257 F.2d 178, 181 (5th Cir. 1958). I find this interpretation persuasive. The opposite view, it seems, artificially forecloses inquiry into the realities of military employment.

■ The second element of the New York doctrine of respondeat superior is the requirement that the employee at the time of the accident be acting in furtherance of the duties owed to the employer. In this regard, New York adheres to the dual pur-

pose doctrine. *See, e. g., Marks' Dependents v. Gray,* 251 N.Y. 90, 167 N.E. 181 (1929); *Clawson v. Pierce-Arrow Motor Car Co.,* 231 N.Y. 273, 131 N.E. 914 (1921). The employer will be held vicariously liable for the employee's negligence if, at the time of the accident, some purpose or business of the employer was being furthered, even if the employee was simultaneously pursuing his own interest. The decisive question is not whether some private purpose of the employee was involved but whether the trip would have been taken if the business purpose had been cancelled. *Cooner, supra,* at 230–31. Judge Cardozo formulated the test in 1929 as follows:

> Unquestionably injury through collision is a risk of travel on a highway. What concerns us here is whether the risks of travel are also risks of the employment. In that view, the decisive test must be whether it is the employment or something else that has sent the traveler forth upon the journey or brought exposure to its perils. . . .
>
> . . . We do not say that service to the employer must be the sole cause of the journey, but at least it must be a concurrent cause. To establish liability, the inference must be permissible that the trip would have been made though the private errand had been canceled.
> . . . The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own (*Clawson v. Pierce-Arrow Motor Car Co.,* 231 N.Y. 273 [131 N.E. 914]). If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk. *Marks' Dependents v. Gray, supra,* at 93–94, 167 N.E. at 182.[1]

---

1. In *Lundberg v. State,* 25 N.Y.2d 467, 306 N.Y.S.2d 947, 255 N.E.2d 177 (1969), a respon-

deat superior case, the New York Court of Appeals held that it is not bound by precedents

Since Flynn's transfer to the Niagara Falls base was made at his request pursuant to the "compassionate reassignment" regulations, the Government contends that Flynn was not fulfilling any business duties at the time of the accident but rather was serving his purely personal interest in being stationed closer to home. The Government also points out that during the transfer Flynn had abandoned the employment relationship to visit his family, and argues that the employment relationship had not resumed at the time of the accident.

Compassionate reassignments are made by the Army in order to resolve the personal hardships of military personnel. The Army's practice is to transfer individuals who request compassionate reassignments to an Army base that is closer to their homes or other locations they desire to be near. (Transcript at 24–25, 27–28). In this case, Flynn was reassigned at his request to the Niagara Falls Support Detachment, the nearest available base to his home in Kersey, Pennsylvania. The Government is correct in contending that Flynn's transfer served his personal interests. At the same time, however, the transfer to the Niagara Falls base furthered the Government's interests. Flynn continued in active service for the Army and was expected to perform specific duties at the Niagara Falls base. (Transcript at 33). Once the Army decided to reassign Flynn to Niagara Falls, he had no option to accept or reject the Army's decision. At the time of the accident, Flynn was acting in obedience to the Army's command to report for duty on December 13. He could not have abandoned the trip without violating his military orders. He therefore was acting with the dual purposes of obeying his employer's instructions and transferring to a closer base.

In determining whether an employee was serving business as well as personal interests at the time an accident occurred, the New York courts, following *Marks' Dependents v. Gray, supra,* and *Clawson v. Pierce-Arrow Motor Car Co., supra,* have applied a "but for" test. If the employee would not have undertaken the journey had the business purpose been cancelled, then the employee was acting within the scope of employment. On the other hand, if the employee would have taken the trip in any event, then the employee was not acting within the scope of employment. *Kelleher v. State Mutual Life Assurance Co.,* 51 A.D.2d 872, 380 N.Y.S.2d 146 (4th Dept. 1976); *Rappaport v. International Playtex Corp.,* 43 A.D.2d 393, 352 N.Y.S.2d 241 (3d Dept. 1974).

Applying these principles to this case, it is clear that Flynn would not have been driving north on U.S. Rt. 219 at the time of the accident had the military orders prompting his trip to Niagara Falls Support Detachment been cancelled. Accordingly, I find that Flynn was acting in furtherance of duties owed to his employer, in satisfaction of the second prerequisite to liability under the respondeat superior doctrine.

■ In reaching its conclusion, the court is guided by *Cooner v. United States,* 276 F.2d 220 (4th Cir. 1960). In *Cooner,* a military officer was traveling directly from Washington, D. C. to Ottawa, Canada when an accident occurred in New York. He selected his own automobile as his mode of transportation and was reimbursed for travel expenses at the rate of six cents per mile. After an exhaustive review of the

in workmen's compensation cases. *Marks' Dependents v. Gray,* 251 N.Y. 90, 167 N.E. 181 (1929), was a workmen's compensation case involving the question of "course of employment" rather than "scope of employment." However, Judge Cardozo's formulation of the dual purpose doctrine relies on *Clawson v. Pierce-Arrow Co.,* 231 N.Y. 273, 131 N.E. 914 (1921), a respondeat superior case, and has been widely cited in later respondeat superior cases. *See, e. g., Shauntz v. Schwegler,* 259 App.Div. 446, 20 N.Y.S.2d 198 (4th Dept. 1940).

The courts have continued to rely on *Marks'* even after *Lundberg* was decided. *See, e. g., Kelleher v. State Mutual Life Assurance Co.,* 51 A.D.2d 872, 380 N.Y.S.2d 146 (4th Dept. 1976); *Rappaport v. Int'l Playtex Corp.,* 43 A.D.2d 393, 352 N.Y.S.2d 241 (3d Dept. 1974). Although the holding in *Marks'* may not be binding, the language quoted above nevertheless continues to accurately summarize the dual purpose doctrine as it is applied in respondeat superior cases.

New York cases and the principles discussed above, the court concluded that the Government was liable for the officer's negligence under the doctrine of respondeat superior.

The Government argues that *Cooner* is distinguishable from this case because the officer in *Cooner* was specifically authorized to drive his privately owned vehicle, whereas Flynn was not. From the facts stated in *Cooner*, however, the officer's orders were identical in this respect to Flynn's: both were authorized to use whatever suitable mode of transportation they desired, including private automobile. *Cooner, supra,* at 223; transcript at 39–41.

The Government attempts to distinguish *Cooner* on the additional ground that it involved a point-to-point transfer without leave time rather than a transfer coupled with leave. It is true that the court in *Cooner* distinguished its facts from cases in which the accident occurred while the serviceman was on leave. *Cooner, supra,* at 225; *see also United States v. Mraz,* 255 F.2d 115, 117. (10th Cir. 1958). Based on the analysis below, I find that *Cooner* nevertheless controls because Flynn was on travel status at the time of the accident.

Although the parties agree that the law of New York applies in determining the Government's liability, the New York courts have never been confronted with closely similar facts for the obvious reason that the state does not employ its own military personnel. The court must turn to federal cases for guidance in its determination of Flynn's status at the time of the accident.

Although the federal cases are conflicting, liability generally has been imposed on the Government where the serviceman was on travel status at the time of the accident. *See, e. g., Berrettoni v. United States,* 436 F.2d 1372 (9th Cir. 1970); *Cooner v. United States, supra; Hinson v. United States,* 257 F.2d 178 (5th Cir. 1958); *United States v. Mraz, supra.* Conversely, the courts in most cases have refused to hold the Government liable where the accident occurred while the tort-feasor was on leave. *United States v. Eleazer,* 177 F.2d 914 (4th Cir.

1949), *cert. denied,* 339 U.S. 903, 70 S.Ct. 517, 94 L.Ed. 1333 (1950); *Noe v. United States,* 136 F.Supp. 639 (E.D.Tenn.1956). Some courts have refused to find the Government liable even where the serviceman was on travel status. *Chapin v. United States,* 258 F.2d 465 (9th Cir. 1958); *United States v. Sharpe,* 189 F.2d 239 (4th Cir. 1951). In New York, however, *Cooner* makes clear the distinction between travel status and leave status is recognized. *Cooner, supra,* at 225; *see also United States v. Mraz, supra,* at 117.

A determination of whether Flynn was on leave or travel status at the time of his accident is therefore crucial. In making this determination, the court is guided by the Army's regulations, the testimony of Col. Bobinski, and the stipulated facts.

Under his orders, Flynn was to leave Ft. Gordon on December 3 and arrive in Niagara Falls on December 13. Delay en route was authorized for seven days, and three days were allotted for traveling at Government expense. Flynn arrived at his home in Pennsylvania on December 3 and visited with his family until December 12, when he left for Niagara Falls. At the time of the accident, Flynn was traveling on a direct route toward his destination. He had completed his visit with his family, and had only one day before he was required to report. As a matter of common sense, it would seem that his seven days of leave time had expired.

This view is supported by the military's Joint Travel Regulations. Under the regulations, members of the armed services are entitled to travel and transportation allowances only for those periods of time when they are actually on "travel status." J.T.R. M3050–1. Travel status commences upon departure from the permanent duty station and includes travel from one permanent duty station to another. J.T.R. M3050–2(2). Military personnel are "deemed to be on travel status *while performing travel* away from their permanent duty station, upon public business, pursuant to competent travel orders . . . ." J.T.R. M3050–1 (emphasis added). Although the regula-

tions do not expressly provide a method for determining which days are applicable to travel status and which to leave status when travel is coupled with leave, this language suggests that the determination depends on whether the serviceman was in fact traveling at the time in question from one permanent base to another.[2] In this case, Flynn was traveling pursuant to competent travel orders directly toward his destination of Niagara Falls. Under the regulation, it would appear that he was on travel status.

This determination is further supported by the testimony of the Government's witness, Col. Bobinski, Director of Personal Affairs for the Army, who stated on cross-examination that Mr. Flynn was on travel status at the time of the accident. (Transcript at 71).[3] Other courts which have considered the regulations on similar facts have also found that the serviceman was on travel status under the regulations. *Berrettoni v. United States*, 436 F.2d 1372 (9th Cir. 1970); *cf. Johnson v. Franklin*, 312 F.Supp. 310 (S.D.Ga.1970).

The Government is correct in pointing out that *Cooner* involved a point-to-point transfer without leave time rather than travel time coupled with leave. But since the court finds that Flynn was on travel status at the time of the accident, this difference is immaterial. The Government has provided no reason, and the court can think of none, for distinguishing this case from *Cooner* based on the mere presence of leave time in addition to travel time.

In support of its position, the Government cites numerous federal cases involving military personnel. These cases are distinguishable, either because they present different factual situations or because they were decided in states taking a more restrictive approach to respondeat superior liability. Although little or no purpose would be served by discussing all of the cases, three of the circuit court's decisions most favorable to the Government illustrate this point.

In one of the earliest cases, *United States v. Eleazer,* 177 F.2d 914 (4th Cir. 1949), a Marine stationed in North Carolina was given two weeks' leave before reporting to a new duty station in Texas. He was involved in an accident while driving his car toward his home in Atlanta, Georgia. Like Flynn, he was allowed to select his own means of transportation and was reimbursed for mileage on a direct route basis. According to the law of North Carolina, the court held in favor of the Government. Its decision was based on findings that the Marine was on leave when the accident occurred, and that the Government had no right to control the details of driving. *Id.* at 917. *Eleazer* is widely cited in those states that have not adopted the dual purpose doctrine and require the employer to control the details of driving, without considering the unique elements of military employment.

In *United States v. Sharpe,* 189 F.2d 239 (4th Cir. 1951), the soldier's paratroop company was permanently transferred from North Carolina to Florida. Rather than traveling by truck convoy with the rest of the company, the soldier was granted permission to drive his own automobile. His pass included more time than would have been allotted for travel time under Army regulations. While driving in South Caroli-

---

**2.** Any ambiguity in the regulations should be construed against its drafter, the United States Army. Moreover, the Government's position, if adopted, would allow it to designate any day on which an accident occurs as a day of leave rather than a day of travel, thereby avoiding liability in all cases where travel is coupled with leave.

**3.** Testimony on this point is not entirely free from doubt. Earlier in the proceedings, Col. Bobinski testified that the Army officials did not designate certain days as travel days and

others as leave days when leave was authorized en route but rather considered the entire period as authorized leave. (Transcript at 19–20). In addition, Lt. Col. Flowers' affidavit, submitted by the Government, states that Flynn was regarded by the Army as being on leave for the entire ten-day period between December 3 and December 13, 1969. (Affidavit of Lt. Col. Flowers, at 5). Since the Army promulgated the regulations, however, any doubt should be resolved against the Army.

na, an accident occurred, and the court held that the Government was not liable. It reasoned that the soldier had the option of traveling by convoy and that therefore the sole purpose of this travel by private automobile was personal. It also found, following *Eleazer,* that the Government had no right to control the employee's activities.

In *Chapin v. United States,* 258 F.2d 465 (9th Cir. 1958), a serviceman was transferred from California to Texas. In addition to travel time, he was granted four days of leave. An accident occurred in California, and the court refused to hold the Government liable. Applying California law, the court attributed the Army's right to control the time, mode, direction and details of driving to its unique military status rather than its function as an employer, and therefore found that the Army had insufficient control of the serviceman's activities.

The vast majority of cases cited by the Government follow one of these three decisions. *See, e. g., Garrett Freightlines, Inc. v. United States,* 529 F.2d 26 (9th Cir. 1976) (following *Chapin*); *Mason and Dixon Lines, Inc. v. Shore,* 409 F.Supp. 1127 (E.D. Tenn.1975) (following *Sharpe*); *Badger State Mutual Casualty Co. v. United States,* 383 F.Supp. 1226 (E.D.Wis.1974) (following *Cobb v. Kumm,* 367 F.2d 132 (7th Cir. 1966)); *Calvary v. United States,* 355 F.Supp. 805 (W.D.Tenn.1973) (following *Eleazer*); *North Carolina State Highway Commission v. United States,* 288 F.Supp. 757 (E.D.N.C.1968) (following *Eleazer* and *Sharpe*). None, however, accurately reflects the more liberal case law of New York.

I find that the plaintiff has submitted sufficient evidence to show by a preponderance of the evidence that the defendant is liable.

A pretrial meeting on the remaining questions, including negligence of Eugene Flynn and the amount of damage, shall be held by United States Magistrate Edmund F. Maxwell within thirty days.

So ordered.